**In re Anonymous No. 13 D.B. 76**

Disciplinary Board Docket no. 13 D.B. 76.

## REPORT OF HEARING COMMITTEE, OCTOBER 13, 1977

A hearing was conducted before hearing committee [ ] at [ ] on Friday, August 12, 1977, from 1:25 p.m. to 2:15 p.m. and the committee deliberated at times thereafter. Respondent was represented by an attorney [A], Esq., of [ ].

The hearing committee submits its report herewith:

## I. SUMMARY

Respondent had been convicted in [   ] County, Pennsylvania, of assault and battery upon a state police officer. The Supreme Court of Pennsylvania by order dated May 8, 1976, referred the conviction to the Disciplinary Board for institution of formal proceedings before a hearing committee to determine the extent of discipline to be imposed (Exhibit P-3). The only issue was the extent of discipline to be imposed, and the hearing committee recommends private reprimand by the Disciplinary Board.

## II. CONCISE STATEMENT OF CASE

In the course of receiving a citation for a traffic violation on a state highway, respondent made a derogatory remark to the state police officer, refused to restrict his movements as ordered by the officer while the latter was preparing the citation, and pushed the left front door of the state police car against the officer's left leg as he attempted to emerge from the driver's seat, causing pain and producing red marks on the leg. Respondent had reason to think that several members of the state police had a grudge against him because of certain conduct in court, but [B], the police officer involved here, did not know [respondent] or that he was a lawyer until afterward.

The defense of self-defense was not accepted by Judge [C] of the Court of Common Pleas of [   ] County who tried the case without a jury. He found [respondent] guilty and sentenced him to a fine of $200 and costs. The Superior Court affirmed the conviction on appeal by [respondent] and the Supreme Court refused allocatur.

The violations of the disciplinary rules of the Code of Professional Responsibility alleged here are:

(1) D.R. 1-102(A)(5)—Engaging in conduct that is prejudicial to the administration of justice.

(2) D.R. 1-102(A)(6)—Engaging in conduct that adversely reflects upon fitness to practice law.

## III. RULINGS ON PROCEDURAL MATTERS

The hearing was originally set for 10:00 a.m. on Friday, August 12, 1977. Respondent was in the course of a murder trial before a judge and jury in [  ]. It was late in the day before the jury had found respondent's client guilty and on Friday morning the jury resumed deliberations to determine the punishment. A continuance was granted, partly because of the insistence of the judge involved, and the hearing on the instant matter was held in the afternoon.

Respondent neither stated that he would file a brief nor waived the right to do so. By letter, petitioner advised that he waived the right to file an initial brief, retaining the right to file a reply brief. No brief was filed by respondent by October 3, 1977, the terminal date.

Respondent requested and was granted the right to file "letters in the form of character testimony" (transcript, pages 16-18). No such letters have been filed, and September 23, the terminal date for filing them, has now passed. No objection was made to the introduction of any of the evidence presented and no ruling was required.

## IV. FINDINGS OF FACT

1. On June 13, 1973, the following perception of

recent events was on the mind of respondent and affected his conduct:

a. On a previous day he represented two persons accused of arson of the [D] Township building, which is located in [  ] County. In the course of the defense he presented he found it necessary to attack the Pennsylvania State policemen involved and their investigation. His clients were acquitted.

b. About a week later, on May 22, 1973, he had a hearing for a client before district justice [E] in [D] Township. The latter's office had been in the building complex which had been destroyed in the fire. Another [  ] County attorney, [F], Esq., had a hearing before district justice [E] that same evening.

c. About a week after that hearing, the said [F], who is not an associate of respondent nor a close friend but merely a fellow attorney in [  ] County, stopped respondent in the [  ] County Court House to ask what respondent had done to agitate the state police. [F] continued by telling respondent that at the above hearing he had overheard two state policemen, who were in the building and apparently in the hearing room, indicate that they were going to "get him," referring to [respondent]; that it was going to happen somewhere in the [G] area; and that "they were going to stop him or make sure he had lost his driver's license." [F] warned him that he should watch out when he was going through the [G] area.

2. On the evening of Wednesday, June 13, 1973, respondent proceeded from [H], [  ] County, Pennsylvania, with a female friend, in a light blue late model Eldorado Cadillac, intending to visit his boat on Chesapeake Bay.

3. To avoid confrontation with the state police, he did not immediately use U.S. Route [  ] out of [H]

but used Pennsylvania Route [  ], a narrower parallel country road, past the [G] area to a point near [I] where he rejoined U.S. Route [  ]. At this point he was out of the [H] state police area and in the [J] state police area.

4. Shortly after turning right on U.S. Route [  ], he passed a Dairy Queen establishment, and he and his friend agreed to go back to get something to eat, neither having had dinner and it being about 9:30 p.m. Doing this involved retracing this route a few hundred yards, going the opposite direction on U.S. Route [  ]. The road here is a four lane highway with a medial barrier broken occasionally, and at a break where a small road came in from the right he made, not a U turn, but a 90 degree left turn into a private driveway of someone named [K] opposite the small public road.

5. To the right of respondent was a group of evergreen trees, higher than a car and very dense, blocking virtually all visibility until the driver was on the shoulder of the four lane highway. If U.S. Route [  ] be regarded as a north-south highway, then south of the group of evergreens on the same side of the road (east) is The [L] Inn with a large parking lot (partially unpaved) between the building itself and the [K] property. As respondent entered this driveway he was aware that a police car was moving across The [L] Inn parking lot.

6. Respondent backed quickly out of the driveway across at least one lane of the highway intending to turn left and proceed north. The police car was in the highway also by this time and signalled respondent to stop. Respondent at first proceeded back into the [K] driveway, then backed out again and placed his car on the shoulder of U.S. Route [  ], a little north of the driveway, and the police car

moved to a point also on the shoulder behind him.

7. Respondent got out of his car to meet the officer (State Trooper [B]) who asked for his cards and told him he would give him a ticket for failure to yield the right of way. Respondent said to him, "You guys are all alike," or words to that effect. [B] instructed [respondent] to sit in his car. [Respondent] refused to do this, but stated that he preferred to stand outside, and he remained between the two cars. [Respondent] wanted to observe whether the trooper would radio for other policemen. [Respondent's] state of mind was that he had the right to be wherever he chose and that the policeman had no right to tell him where to be.

8. [Respondent] moved around a bit; the trooper who had returned to his car again ordered [respondent] to return to his car and [respondent] again refused. One reason in the trooper's mind was that traffic was moving fast in close proximity to the two cars and he was concerned about the safety of both of them. Having finished writing the ticket, the trooper grasped his flashlight (out of routine, since it was dark, but as a weapon in the mind of [respondent]) and opened his left front door. [Respondent] pushed the door back against the trooper's left leg causing pain and producing red marks on his leg.

9. Trooper [B] thereupon radioed for help and after help arrived arrested [respondent] who was taken before a district justice and held for court.

10. Trooper [B] is assigned to the [J] area but lives in [D] Township, which is in the [H] area. There is no evidence, however, indicating that he knew anything about [respondent] before the incident of June 13. Moreover, he did not know that [respondent] was a lawyer until after the incident was over.

11. Respondent was convicted of simple assault and battery upon [B] in the Court of Common Pleas of [ ] County, Pennsylvania, in a trial before Judge [C] without a jury on February 11, 1974. After an appeal to Pennsylvania Superior Court affirmed per curiam without opinion and after a refusal of allocatur by Pennsylvania Supreme Court, respondent was sentenced on March 22, 1976, to pay a fine of $200 and costs. A motor vehicle charge brought against him was dismissed for reasons which were not clear to the hearing committee, but it may have been of a procedural nature. (Committee relies on Exhibit P-5 rather than Exhibit P-1.)

12. The offense of which respondent was convicted was punishable under Pennsylvania law by a sentence of one year's imprisonment or upward.

13. A large part of [respondent's] practice is the trial of criminal cases. It is his estimate that he handles eight or nine percent of the entire list of criminal cases before the Court of Common Pleas of [ ] County, Pennsylvania.

## V. DISCUSSION

Under Rules of Disciplinary Enforcement, Rule 17-14(c) (old style and probably applicable here) or under Rule 214 (new style but identical for all purposes here), conviction of an attorney of a crime punishable by imprisonment for one year or upward in Pennsylvania is an automatic ground for discipline of some sort. Once the conviction is proven (here admitted as well as proven by Exhibits P-1, P-2, and P-5), the sole function of the hearing committee is to determine the extent of final discipline. The testimony of respondent was taken and the notes of testimony of the trial before Judge [C] in [ ] County were admitted in evidence.

The testimony before Judge [C] does not differ greatly from the description given the hearing committee by respondent himself, except that the testimony in court by trooper [B] indicated more clearly the degree of harrassment he felt by respondent's conduct prior to the assault. The only important conflict is that respondent states that when Trooper [B] opened the car door, he hit [respondent] with it, who stepped back about one step and "almost reflexively pushed the door back" (N. T. page 25). [B] testified in court that [respondent] rushed forward toward the opening door to close it on [B] and that the latter had to use all the force he possessed with his left shoulder to relieve the pressure on his leg (Exhibit P-4(a) page 22). It is evident that Judge [C] did not accept self-defense as a defense, because he convicted him.

The committee notes that under Canon 1 of the Code of Professional Responsibility at footnote 13 is a reference to assault and battery. One of the implications is that such a reference is misconduct under at least one of the subsections of D.R. 1-102(A).

It is evident from the foregoing that the assault and battery was not as heinous as would be conjured up in the mind when one hears that a person has assaulted a police officer. What is disturbing, however, is the attitude of respondent toward an officer of the law in the course of his duties. He was not prepared to accept the officer as his superior for the moment. A police officer is the personification of the Commonwealth, the sovereign, while in the course of preparing a summons. He must be in control. There are many dangers which attend a policeman while on duty, and he is entitled to a minimum of distraction from the person he has

accosted, so that he may remain alert for the unexpected.

The situation tends to be quite different in the courtroom, where the judges and the lawyers are in control, but the role the lawyer plays there cannot be played under other circumstances and certainly not as a motorist on the public highway. The lawyer is not entitled to a carry-over of this superior position outside the practice of law. To do so borders on arrogance.

It was the attitude of respondent toward the policeman which cast discredit on [respondent] when he first reacted and thereby cast discredit upon the bar when it became apparent [respondent] was a lawyer. A lawyer, who is supposed to support the administration of justice, was perceived to be obstructing its course. If he repeats this aggressive, belligerent attitude under other circumstances, he will continue to degrade himself and indirectly degrade the bar. Such tendency he must learn to restrain. Temper is no excuse. He must learn to control himself. If he does not, he will again find himself before a committee such as ours.

The breach was too serious to be accorded an informal admonition. It is too mild to warrant the notoriety of public censure. In the judgment of the hearing committee, the proper punishment is a private reprimand to be administered by the Disciplinary Board.

## VI. CONCLUSIONS OF LAW

Respondent has violated D.R. 1-102(A)(5) in that he has engaged in conduct that is prejudicial to the administration of justice and D.R. 1-102(A)(6) in that he has engaged in other conduct that adversely reflects on his fitness to practice law.

## VII. RECOMMENDED DISPOSITION

The hearing committee recommends that respondent be given a private reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania.

## PRIVATE REPRIMAND

UNKOVIC, *Board Chairman,* January 18, 1978 —As you previously have been notified, the Disciplinary Board on November 18, 1977, determined that petition for discipline filed against you, docketed at 13 D.B. 76, should be concluded by private reprimand. You were subsequently notified by certified mail, under date of December 27, 1977, to appear at this meeting of the board, for the purpose of receiving the private reprimand.

The record indicates that you have been found guilty of transgressing Disciplinary Rule 1-102(A)(5)—(engaging in conduct that is prejudicial to the administration of justice) and Disciplinary Rule 1-102(A)(6)—(engaging in conduct that adversely reflects upon his fitness to practice law).

It is fortunate for you that the board determined only the imposition of a private reprimand and not a form of public discipline.

As chairman of the Disciplinary Board, it is my duty to reprimand you for your misconduct. We urge that you conform to the code of professional responsibility in your future activities. Any subsequent transgressions on your part can only result in further discipline and perhaps more drastic sanctions. We sincerely hope that you will comport yourself in such a manner that future disciplinary action will be unnecessary.